May it please the Court, my name is Bill Dickus. I represent the appellant and defendant, Mr. Breeden. If you could keep your voice up a little, I'd appreciate it. Thank you, Your Honor. And this is scheduled for 20 minutes. I'm not sure that it will necessarily take 20, so if you feel the desire to sit down after a few minutes, that's okay, too. Thank you. The scheduling is approximate. If you need your full 20 minutes, absolutely take it, but if you don't need it, that's okay, too. Okay, and I may want to reserve a couple minutes for rebuttal as well. Sure. Initially, I have two apologies for the Court. The first is I didn't include the testimonial excerpts in the initial excerpt of record. I didn't correct that until the further excerpts of record, and to the extent that's inconvenient to the Court, that's my inexperience. Second apology is there's a lot of issues in this case, and I couldn't boil it down to one or two. And I know I have to address the misrepresentations in the content list, because that's the sole basis by which the trial court voided the insurance policy of summary judgment. And as I understand the record, your client doesn't dispute that he did misrepresent the losses during the adjusting process. No, that is disputed. I can get to that in a moment. I thought he admitted on deposition that he had. He admitted at his EUO that he, everyone exaggerated. He admitted that. I thought it went further than that. Didn't he admit that he listed a seven-piece sectional couch, when in fact it was a three-piece couch, and then didn't the children get on and say, no, there weren't 855 videotapes in the house that were significantly less? No. He went to a furniture store after the fire with his girlfriend, and he pointed out a couch that he believed to be a three-piece sectional couch. And he asked the furniture store to list that with other items that he believed were comparable to his own. That couch was listed at $4,200, and it was listed as a seven-piece sectional. When he was asked about that initially in the phone call with Mr. Blodgett, he said, I didn't know they had listed it as seven pieces. I don't believe it was seven pieces. It looked comparable to my three-piece. And I didn't pay $4,200 for my three-piece sectional sofa. I paid $3,200. But that's the price that they put onto it. Now, at his deposition, many months later, he testified that I did go again after the weren't other sections. They were marble tabletops on the end and a phone drawer in the middle. And he said that was exactly like mine, and $4,200 is the replacement value of my couch. So as to that, no, he didn't admit that was a misrepresentation. He did say at his examination under oath that he thought the children lied and exaggerated the quantity of videos and CDs. But his explanation under his affidavit is that's what he was told off the record by the attorney who conducted their EUOs at which he wasn't permitted to attend. He submitted two separate proofs of loss, one for $33,000 and one for $69,000. So what's the explanation for the discrepancy in the valuation of the claim law? Well, he has an explanation, and it's a very clear explanation. And both of those schedules were invited by all state agents. The first schedule was invited by Greg Richards, the sales agent he went to. And Greg said, find the maximum value you can, because they will depreciate it to 20 and 30 percent of whatever you state. Okay, but that provides a motive. And I guess in his examination under oath, he admitted that the August 15 inventory was extremely exaggerated. That's right. Isn't that right? Why shouldn't that be sufficient for the district court to conclude that he's made a material misrepresentation as to the amount of the loss, particularly when faced with almost, what does that work out to, about a $60,000, $70,000 difference between the first claim and the second claim? Okay. First of all, exaggerated by definition at the EO was a word that Mr. Pierre Lee gave to the insured, and he said it was exaggerated because you put replacement costs, not actual cost. And it's true. He conceded from day one, he's putting replacement costs on this first schedule, because that's what he was told to do. Now, did the policy cover, in terms of the obligation of the company, replacement costs? Yes, it was all replacement costs. So he was asked to put down purchase price, even though that was not, in fact, what he was supposed to get. He was supposed to get replacement costs. No, he wasn't asked to put down purchase price. He put down replacement costs, because that's what the agent told him to do. But does the form say purchase price? The form, there are many forms, but one of the forms has ACV on it. One of them had cost, and one of them had replacement cost. On his first schedule, all of his values were under the replacement cost column. And there was no purchase cost, because he told him that was too hard. Nobody can do that. Now, the second list was invited by Pierre Lee. He said, look, they're holding up my house. I can't get it built. It's been six months. What do I do? I'm now with a third or fourth adjuster. And Pierre Lee says, here's what you do. You go back. You take everything off the initial list that doesn't have photographic evidence of itself in the remnant ashes. You value those at garage sale prices. And then you submit that new second list to Allstate. And that was invited, and he did it. Well, what do we do with this sentence that's quoted in the district court's opinion and order at page seven? After drafting the August 2000 inventory, we even dreamed up a few extras to break even for some of the things we wanted to replace. Right. I don't know what that means. It's pretty clear to me what it means. I don't know what extra he dreamed up, and I don't know who he was. There's no reference to any identification of what that extra was supposed to be. Why couldn't the district court conclude we meant he and the children, since the children were also admitted to his address? What he said is he bumped up the furniture. It may be they put other clothes on it. It may be they put other CDs on it. Well, we dreamed up a few extra things. Speaks to me of the fact that they just made stuff up that he didn't really own in order to kind of balance everything out. Is there any other interpretation of that? There's no identification of that. Are we talking $100, $1,000, or $10,000? Well, I guess the question for me is we're here on summary judgment, and you're arguing that the district court should not have entered summary judgment, and I'm trying to find whether there really is a contest over the material fact as to whether or not he misrepresented the amount of the loss, because if the conclusion is there really isn't a dispute that he did, in fact, misrepresent the amount of the loss that he suffered, then isn't the district court correct in entering summary judgment? What we're dealing with is 13 months of process. The initial list was submitted within two months of the claim. It was submitted at the invitation of Greg Richards. Greg Richards told him put things on it you don't own and slip in Kim Harden's property. He didn't do either of those two things. He later said when he complained about the inaction six months later, we dreamed of a few extras, and we bumped up the furniture. He later said at his deposition a year later, I didn't bump it up at all. That was exactly the right same couch, and it wasn't seven, it was three. But that's not all that's necessary to void the policy. What's necessary to void the policy is intent to deceive, reliance, detrimental reliance to the insurance company. There is no evidence of detrimental reliance to the insurance company, or even belief of a misrepresentation. So is your position the fact that the insurance company actually paid out funds under the policy and was put to extra investigative efforts when they suspected that there was fraud, that that's not sufficient evidence of reliance under the Oregon statute? Those aren't the facts. The facts are that he was begging for money. They wrote him a total by three different people of $15,000, and at three different occasions by three different persons, each one of which said, I knew that there were suspicions of fraud. I knew it was under investigation for fraud, but I also knew his total claim would be way more than the issues that were in dispute. But if the policy is void, the insurance company doesn't owe him a dime. That's not true, because they owed him the dwelling coverage. I haven't even gotten to that yet. And they also owed him the additional living expense coverage. So what's voided then? Just the claim for lost property? Well, that's the first error of the trial court. He voided both the dwelling coverage and the contents coverage because of a fraud claim in only the contents list. Let me ask you this. Even assuming, and I understand that you're backing and forthing on this question, but even assuming that there was a fraudulent misrepresentation as to the amount of loss of personal property, as I read the Ells, I'm having trouble pronouncing the name of it, Aslamazar case. That in itself doesn't matter because of the way Oregon interprets the concept of reliance. The reliance that the company is put to, and they can tell me if I'm wrong, is that they've spent, so far this time in terms of payout, they've spent $15,100 and they've investigated the claim. But as I look at the facts as described in the Aslamazar case, the investigation in that claim and the fraud in that claim were both greater. Nonetheless, the court doesn't find reliance within the meaning of Oregon law. So for my purposes, I don't care if I'm reading Aslamazar right that your client might be defrauded in precisely the way Allstate says he defrauded. The policy still isn't voided. Thank you, Your Honor. I appreciate that statement. I'm not sure it's a question. It's not a question, but it's maybe you guys get ready because that's where I'm inclined to be unless you can talk me out of it. But let me also talk to the language that misled the trial court. The statute of the language since 1907 has said the entire, quote, policy is voided under certain circumstances, including misrepresentation. Since 1913, that has been interpreted to apply only to the coverage. The 1913 Oatman case cited in the reply says that the dwelling coverage is separate from the personal property coverage, and even if the dwelling coverage were to be voided for some statutory reason, the personal property coverage would be separately payable. Allstate has not argued otherwise. Allstate has never claimed in this case that the dwelling coverage is void because of misrepresentations in the contract. Could it be void because of the fact that he engaged in unauthorized or unlicensed work on the premises? There was something in the record about the fact that he commissioned somebody to do some work that might have started the fire. I know. Oh, well, that is the argument that they made. And it's wrong. So there's a separate provision that voids the dwelling? The court didn't address that argument. The separate provision of the policy is it's voided because there was faulty workmanship and because there was a known increased hazard that he failed to correct. Those are two separate provisions of the policy. They both focus on fiberglass insulation that was left in outlet boxes in a family room five years before the fire. At his EUO, he testified the fire department told him that the fire, he believed, was caused by that fiberglass insulation in the outlet boxes that built up excess heat. And when he was asked, why didn't you take it out, he said, I didn't know it was there. I saw my nephew putting it there five years earlier. I told them all to take it out. I thought they had. The problem is that's not what caused the fire. They had Allstate send their own cause and origin expert to the premises, and he testified without contradiction the fire didn't cause it, there's no burn patterns to support that. I don't know what caused the fire. And so what they did to deny the dwelling coverage in the underlying record is they claimed falsely that he admitted that that was the cause of the fire. He said, I don't know if the fire department is correct or not. They claimed that was the cause of the fire in contradiction to their own expert, and they did never argue that the fraud voided the dwelling coverage. The court never addressed the dwelling coverage as separate coverage. But we asked for a summary judgment paying the dwelling coverage of $211,000 because there's no evidence of arson, there's no evidence of fraud in the dwelling, there's no evidence that anything he did caused the fire. In fact, nobody knows what caused the fire. And that was simply overlooked in the trial court. Now, I would like to – there's other issues I haven't gotten to, but thank you, Your Honors. I'll save some for you now. Let's see what the other side says and then we've got some time. When you're ready. And I hear you coughing. If you have some trouble, take your time, have some water, whatever you need. May it please the Court, Lisa Lerer, appearing on behalf of Allstate. I'd like to just jump in and address three main points that I think will help clear up the confusion that I think there is in this case. The first question has to do with the Islamazar case and how that affects the question of the misrepresentations here. In the Islamazar case, the court never reached the question of whether there was detrimental reliance because the insurance company never argued that there was. The insurance company argued that they simply didn't have to prove detrimental reliance. That attempted to explain why the statute, as it was written, addressed only misrepresentations in claim in applications as opposed to misrepresentations in claims made against the policy. If you look at the very end of the opinion, the second to the last paragraph, and then the last sentence there, the court talks about, to avoid the policy, in the defense of the claim, the defendant had to establish that it relied on the misrepresentations. I'm sorry, where are you? Are you on Islamazar? Yes. Second to the last paragraph. Second to the last paragraph. This paragraph begins, we conclude that. Correct. Okay. And then the court says, we conclude that you have to prove reliance. And then the court says, defendant made no showing in this case. The trial court therefore erred in. Made no such showing in this case. There was no showing. There was no effort at all to show. Wait a minute. No effort is different from no such showing. How do you know they made no effort? I handled the case. That's good. I've got to write that one down. How do I know, reading the opinion? If you read earlier in the opinion, it talks about, it's clear that what the insurance company is arguing, all the way through the case, is that they did not have to establish reliance at all. They never made any effort to show reliance because they construed the statute as requiring reliance only if you are dealing with misrepresentations in a claim, I'm sorry, in an application as opposed to in a claim. And throughout the opinion, the court talks about why that construction of the statute is wrong, that the history shows that the legislature intended to require proof of detrimental reliance, both with respect to applications and with respect to claims. The court then also discusses in Islamazar the fact that it would be difficult, it can be very difficult to establish. Let me read to you from the previous paragraph in Islamazar. So I'm trying to figure out what's in the court's mind and what the law is we're supposed to take away from the case. And so the court in Islamazar says, defendant's only argument is that by the very nature of things, insurers rely on insurer's representation in ascertaining the true facts of the law. As they say, by the very nature of things, there is reliance. Beyond that, defendant offers no evidence that it changed its position in any way, that it offered coverage, which is not an issue here, this is not an inducement case, that it calculated its risk, that's not an issue here, or that it incurred additional expenses in conducting its investigation because of the plaintiff's misrepresentations. Correct. The court is saying there they never offered evidence, they never tried to prove it. And if you read the analysis that's prior to this, before the court gets into the legislative history, it's clear that what the insurance company was arguing in that case was the distinction between having to establish detrimental reliance in connection with an application where the insurance company is going to obviously grant or issue a policy based on a misrepresentation versus establishing detrimental reliance in a claim the court acknowledges and the insurance company had argued. It's often very difficult to establish detrimental reliance with respect to a claim because unless you pay it out, unless you pay out the claim under the analysis that was being applied, you would not have any detrimental reliance. But the court acknowledges both in the paragraph that you were reading there and prior to that in the paragraph that begins with the head note six, ordinarily to show reliance, the court talks about different ways in which an insurance company might show reliance with respect to a claim. And, you know, one way is making advances. Another is the increase in expenses caused by investigation of what turns out to be a fraudulent claim. Now, the magistrate's judge relied only on the Callaway case in his order. Is the Callaway case relevant? The Callaway case is relevant in the sense that it talks about the elements that you need to establish a fraudulent misrepresentation. But is the Callaway case operating under the same statute that requires reliance? It's not. So it's not relevant. Well, it's relevant in the sense that it discusses, along with several other cases, the general elements of a fraudulent misrepresentation. But there's a special statute in Oregon based on fire insurance. Yes. Which was not an issue in Callaway. No. But the only relevance of Callaway is the general discussion of the elements of a fraud and misrepresentation defense to an insurance policy. But it does not deal with the requirement of detrimental reliance. And reliance is what we're arguing about. Reliance is what we're arguing about here, yes. And the reliance, again, is the evidence and the record about the advances that were made. All three of justice. Are you arguing that the advances constitute detrimental reliance within the meaning of Slamazar? That insofar as the advances were made based on the belief that the original inventory, August 15th inventory was valid. That all three. I think I asked a yes or no question. Are you arguing that the advance of $15,100 was detrimental reliance within the meaning of the Slamazar case? Yes. Yes. Was there an advance in the Slamazar case? I don't believe so, no. I may be wrong. That's your case. No. I don't believe that there was an advance in the Slamazar. I think the claim was denied without advance. I'd have to. I thought there was. But it's your case. I'll trust you until I find different. Okay. And I could be wrong. But I don't believe that there was an advance. But that's not the only detrimental reliance you have here in a Slamazar. They also talked about another way of establishing detrimental reliance is the increased expense of investigation based on having to do the additional investigation to determine the validity of the claim. And there is evidence in this record about hiring an investigator to try to determine whether, in fact, the quality of the furniture was as represented, as well as the quantity of items that were claimed in the August 15th inventory. The other two main points that are involved here, one is the question of severability, whether if, in fact, there was misrepresentation with respect to the contents claim, that voids the coverage as well for the structure, the house itself, the real property. And it's our position that it does. The statute requires that the policy contain a provision that says the entire policy is void. And the policy does say that. The entire policy is void if the insured has made a misrepresentation. The difference between what we're talking about here and the previous general case that the plaintiff has cited is the nature of the issue that was involved there. That case arose at a time when, in order to have coverage over real property, you had to have a fee simple interest in the property. The insurer did not have a fee interest in the real property, but did have personal property that was involved. The court ruled that because you don't have a fee simple interest in the real property, you cannot get insurance coverage for that because that was the law at the time. But you could sever out the personal property because you could still have insurance on personal property. We're dealing with an entirely different situation here. We've got a statute that makes the entire policy void if there is a misrepresentation. What proof have you put into the record in this case of the amount of what you're now calling additional investigation? I don't know that there is evidence in the record about the dollars that were spent. There is evidence about the nature of the investigation that was undertaken, hiring the person to do the evaluation. Is there evidence in the record that this is additional investigation on account of the suspected fraud? Yes. Do you have evidence in the record as to what your normal practices are with degree of investigation? Only in the sense that the adjusters testified that where they are given reason for suspicion, then they go into the additional investigation. It gets assigned to a special investigations unit, and they hire people to do the evaluation of both the quality of the debris that's left behind and the quantity. If, in fact, the inventory list that is submitted seems to fit with what the adjusters themselves find to be in the evidence in the debris, and it makes sense based on the information that they have about the case, there's no need to go to a special investigations unit, and the adjuster can resolve it themselves. How much of the special investigation was due to suspicions of arson or lying about the cause of the fire? That played a role only in the sense that there was some information given both about Mr. Breeden's participation or knowledge of the use of the insulation in the outlet valves, and also some indication that he might have had reason that there was some suspicion about the cause of the fire because it was undetermined. One of the problems I have with this case and its current posture is that the district judge recites only one case, the Callaway case, which in my mind is manifestly an opposite of the question of detrimental reliance because it's not a fire insurance case. And the record as it comes to us is somewhat undeveloped, and we certainly don't know what the magistrate judge thinks is detrimental reliance in the sense of additional investigation. No, he did not discuss that. That is in the record, and certainly this Court can affirm. What's in the record? The fact that he didn't discuss it? No. What's in the record is the evidence about the additional investigation that was done. But there's no fact-finding from him as to, you know. There is no fact-finding. And there may be some dispute between you and the other side as to how much was additional on account of a suspected over-claiming of personal property. Well, what you have is testimony that the additional investigation was undertaken. There's not a discussion in the record about the amount of money that was spent on that. You have the testimony. And maybe it's hard to sort out based on the current record as to how much additional was done for what reason. That's to say you had some problems with this claim, not limited to the over-claiming on the personal property. There were other things that were being investigated, but I think it's very clear from the testimony and the chart notes from Ms. Lewis that she talks about the reasons that people were assigned to do the additional investigation was the belief that the August 15th inventory was inaccurate and overstated. Now, is this a case where we should certify to the Oregon Supreme Court to ask them what they mean by additional investigation? Well, I don't think that's necessary. I mean, the Oregon Supreme Court has not talked about the reliance issue. The Islamazar case from the Court of Appeals is the only decision that talks about the reliance issue since the statute was amended. But I think the Court of Appeals statement is a clear statement of the types of things that can be considered as additional expenses. Well, I kind of take you at your word. There was nothing in front of them, and they say there's nothing in front of us. So they didn't do a lot of parsing. They did say there's no evidence of additional investigation. No evidence was presented. They didn't say some additional investigation in any degree would void the policy. They didn't say you need a substantial amount of an additional investigation. All they said is there's no evidence of additional investigation. But they did say that additional expenses by the insurance company investigating a fraudulent claim constitutes detrimental reliance. Do they say that? I think it comes with the discussion about the types of things that can be considered when the court says the only argument is that by the nature of things That's right. That's the language I was referring to. It says there's no evidence here, but it doesn't say how much evidence would be required. It just says there's no evidence at all. Well, I think to show detrimental reliance, all you've got to show is that you incurred additional expenses. Twenty-five cents worth? Probably not. Twenty-five dollars worth? I don't know that you would make... A hundred dollars worth? I can't give you a number. Well, I can't either. Because I don't think Islamazar gives it to me. I don't think Islamazar does either because the court didn't have to decide that issue since there was no... So we're back to where we were when I talked to you. That is to say Islamazar doesn't tell me. Islamazar doesn't tell you how much you have to spend in additional money in order to constitute... That's right. And nor do I know from the record how much you spent. No, but you do know that the additional investigation was undertaken, and it's described what was done in terms of the investigation. And that would not have been necessary had there been no fraudulent misrepresentations. The third area that was addressed is the question about what, in fact, Mr. Breeden said or what kinds of admissions he made with respect to the misrepresentations. And set out in a statement of facts with citations to the excerpt of record are several different times when Mr. Breeden acknowledged that the statement that was issued, the inventory that was done on August 15th was inaccurate. He talks about the value listed about the shelf stereos being outrageous, that they had bumped things up, that they had padded things. The claim, the original list was extremely exaggerated, that they had inappropriately inflated the number of video games. We even dreamed up a few extras to break even for some of the things we wanted to replace. It's very clear that he acknowledged that the original inventory was not accurate and that they had dreamed up things or padded it. When he made his complaint to the insurance commissioner, he acknowledged that he had misdescribed things. Now, I'm not sure who's telling the truth, and so I'm just recounting what people are saying without making any judgment as to what's true. The claimant says that he was instructed by, was it an insurance agent, to bump things up because they're going to cut you back down and then you'll come out about where you should come out. He did testify to that. He also testified that he didn't follow that advice. Now, I'm asking a question still. And was the person who told him that an agent of Allstate or was an independent agent? No, it was an agent of Allstate. And can he argue detrimental reliance on a statement by an agent of Allstate? He stated several times that he did not follow that advice because he believed it was incorrect, that he should not do that. He stated that he did not follow that recommendation. Actions speak louder than words. Sounds like that's exactly what he did do. Well, but then he said later that we did bump it up, but he initially said we didn't follow his advice because we knew it was wrong. He also stated that he knew he had to submit an accurate statement, and if you look at the sworn statement of proof of loss, there's a certification in there. Let me go back to the question I asked, and that is to say you're trying to tell me why it's not true, and I'm not trying to judge whether it's true. Let's assume for the purposes of the question that he was told by an agent of Allstate, bump up your valuation because they're going to cut it back down again. He bumps it up. Is there detrimental reliance on his part, and does that matter to this case? I don't think it matters because I think— That is to say Allstate can mislead him and then punish him. No, Allstate can't mislead him and then punish him. Then why doesn't it matter? Because he signed a statement that says he didn't do that. This sworn statement of proof of loss says this is accurate. I have not added anything. I have not said in here, I have not listed anything that I didn't owe or that I didn't lose in retirement. But you're not following me with the question. Again, I'm not judging what actually happened. I understand. I'm assuming that the agent of Allstate told him bump up your valuation. Don't tell them, of course, you're bumping up the valuation. Just bump it up. So he bumps it up. And, of course, in doing that, he signs a piece of paper that says I'm not bumping it up because obviously that's not going to be following the advice. So when you say, well, he signed a piece of paper, no, that's entirely consistent with the question I'm asking you. Well, I think you have to add in the fact that not only did he bump up valuations, he added things in there that clearly weren't there. You've got a list of 855 videos that are listed out by title in alphabetical order. And they come back later and say, well, we didn't have all those. I'm not arguing here that he's a truth teller. I think we've got a lot of evidence that he's not a truth teller. But I think there's a difference between simply bumping up the value of the things you put in there so you're hoping you'll get what amounts to 50% instead of 30% of it and actually adding in items that you never owned. There's a significant difference there, and it's two different types of misrepresentation. And I think even if he says he wanted to rely or did rely on a statement that you should have bumped up the value, that doesn't justify adding. That's not an explanation for adding things that you never did own. Well, my question is a very simple or maybe dumb question. But as a trial judge many years ago, I learned that on these insurance loss claims that were contested, that detrimental reliance was usually a question of fact. And here we've got a summary judgment, which apparently has decided a whole lot of facts. And I just wondered how you get around the general rule that questions of fact are for a trial and not for summary judgment. Well, I think that, I mean, obviously questions of fact end up being for a trial court and not for summary judgment. But there are certainly issues that, while they often may be issues of fact, can be resolved as issues of law. Well, let me ask you to help me on a couple of specifics. $1,200 for first and last month's rent for substitute housing. What's detrimental reliance about that? At the time that that was given, the inventory hadn't been done. There's no detrimental reliance in that. Okay, what about the, what was it, $5,000 to help them replace some necessary stuff? The advances that were given on the property coverage, the personal property coverage. Don't you have internal memos in your file that show that the, that if the amount of the ultimate payout, if any, on this case was more than the advances, that there wouldn't be any detriment to the company? Well, I disagree. Because if, in fact, they made fraudulent misrepresentations, that voids policy. And there wasn't any obligation to make anything. Your whole case turns on the all or nothing proposition that if there was any little fraud at all in the enumeration of the articles and tapes and stuff that was burned, if they were burned, if there was any fraud at all, that voids the whole policy. So there's no reason to go to all the trouble of counting the bodies or whatever. And that's based on the language of the statute. And, again, the misrepresentation has to be material. The statute so provides. And we believe the misrepresentations are material. But the statute itself, and the statute says it and the statute requires that the policies say that this entire policy is void if you make misrepresentations, material misrepresentations about the subject matter of the insurance, and we rely on it. It requires mandatory provision of the policy and the statute. The other issue here is about the replacement cost, the question about being asked to give an inventory of actual cash value when the policy provides replacement costs. The policy very clearly sets out, and the case law explains why this is so, that the insurance company will pay actual cash value for any item when you have replacement cost coverage unless and until you actually make the replacement. At that point, you get the difference between the actual cash value and the replacement cost. That rule existed to avoid what had been determined to be a moral hazard. I'm not sure that's sufficiently central that we need to spend argument time on. You've run over. Okay. Thank you very much. Thank you. Mr. Dickes, I think you've saved some time. Thank you. The record shows that three months before the first EUO was scheduled, he had submitted because his house was in foreclosure because they had failed to pay the mortgage claim for no good reason, except they didn't want to. Three months before they did the EUO, he said, I will settle everything for $42,000. I will give you a credit for the 20 you've already paid me. I don't know how he calculated that. I'll take $22,000. I'll waive all other claims, including any replacement value claims. You asked the person who was handling the claim, who was a fraud investigator, not an adjuster, although she didn't tell him that, why didn't you take that? She said, if he made a misrepresentation anywhere, I don't have to settle the claim. That's all states' position. If you make a misrepresentation anywhere in the process, it's a game of gotcha. All bets are off. You're in SIU special investigation, and all we're going to do is prove the fraud. We don't have to prove reliance because their policy illegally doesn't contain that provision, and it hasn't contained that provision for 15 years. But isn't that what the statute defines? I mean, isn't your argument really with the legislature? No. The statute says that if there is a material misrepresentation, it avoids the policy. No, it says that if the insurance company proves that it was material and that they relied upon it, what lie did they believe? They didn't believe any lie. They knew there were suspicions when they paid them that some of these things were inflated, but they also had a reserve for $131,000. The record says they expected anywhere between 80 and 120. They paid them 15. They were playing gotcha. They were saying, if we can prove three months after your settlement demand, which we ignored or offered, which we did. So are you advocating that the rule should be that even if there is clear evidence of fraud in connection with the proofs of loss, that until the insurance company advances more money than it would otherwise have had to pay if the insured was truthful, then there is no detrimental reliance? Is that what you want us to believe? I do believe that should be the rule, but that's way beyond what I need in this case. That's way beyond what the statute provides, isn't it? I'm not sure. The statute and the case law combined said there has to be a lie. You have to believe it. You have to detrimentally rely on your belief in the lie. They believed no lie. Well, Mr. Dickens, if the policy of the law is to do what is reasonable, and if the legislature enacted this statute to address a very widespread problem of fraud in connection with insurance claims, why shouldn't we interpret the statute consistently with what the legislature did? That's just the opposite of what the legislature did. What happened in 1964 is the Oregon Supreme Court said reliance is no longer a factor. They turned back 60 years of case law. And for the next 21 years, the insurance companies were simply looking for any lie to avoid the entire claim. So a little bit of lie is okay as long as it doesn't exceed the amount that the insurance company would otherwise have to pay. No. What the legislature said in 1985 is that you can't use any lie to avoid a claim unless you can prove reliance. And here, how can they prove reliance? They had a $42,000 offer that they ignored because they were still trying to catch a lie from six months earlier to try to avoid the claim because that was their practice. Now, it may be. When you say that was their practice, do you have evidence that this is a generalized way that the health state does business in this case? I mean, do you have evidence in this case that that's the way they do business generally? I have evidence that they didn't change their policy in compliance with the statute. And for 15 years, they were issuing that policy. That evidence is in the case. I have evidence that both Ms. Rohde, the fraud investigating manager, and Ms. Lewis, the actual investigator, said, if he made a lie, we don't have to settle. Ms. Rohde says, if he ever lied, he gets no second chance. It never even dawned on them that reliance was a fact. Well, if that's what they were really doing, that is to say, if all state thought or acted on the thought there, the only thing they had to prove was a lie, that might mean that their reliance on trying to investigate the lie was premised upon a misunderstanding of the law. Now, that's an odd argument for reliance on their part. If they're trying to say, well, all we need to do is find a lie, so they keep trying to find the lie, that might change what they're relying on. And, Your Honor, it's a factual question. My basic problem with this case is I don't have a factual record based upon what the reliance was, what the actual reliance was because of the lie, and I don't quite understand what Islamazar means. And the district judge hasn't given me a chance to, by even talking about the case. I know I'm over. There are four other issues I've briefed and I haven't even mentioned. Thank you very much. Thank you. Thanks to both sides. And I must say, I was not only wrong, but spectacularly wrong as to how much time this argument would take. Thank you. The case of Allstate Insurance v. Reedy is now submitted. Thank both sides for a helpful argument. Thank you. The next case on the calendar is Connell v. Multnomah County. You know, as you're setting up, we'll take a five-minute break. You've been set up for a long time. All rise. Thank you.
judges: Goodwin, W. Fletcher, Tallman